[See United States v. American Gold Coin, Case No. 14,439.]

---

## AMERICAN HAIR MANUF'G CO., (MUSCAN HAIR MANUF'G CO. v.)

[See Muscan Hair Manuf'g Co. v. American Hair Manuf'g Co., Case No. 9,970.]

---

## AMERICAN HARD RUBBER CO., (ABBOT v.)

[See Abbot v. American Hard Rubber Co., Case No. 9.]

---

## Case No. 302.

AMERICAN HIDE & LEATHER SPLITTING & DRESSING MACH. CO. v. AMERICAN TOOL & MACH. CO. et al.

[Holmes, 503;[1] 4 Fish. Pat. Cas. 284; Merw. Pat. Inv. 99.]

Circuit Court, D. Massachusetts.   Nov., 1870.

PATENTS FOR INVENTIONS — SUIT FOR INFRINGEMENT— STATUTORY NOTICE TO LICENSEES — DEFENSES—PUBLIC USE—BURDEN OF PROOF—ABANDONMENT—PRESUMPTION—DRAWINGS OF PATENT.

1. Under the act of March 3, 1839, (5 Stat. 353,) a patent is invalid, if the patented invention was in public use (unless merely for purposes of experiment), or on sale, with the consent or allowance of the inventor more than two years before his application for the patent.
   [Cited in Consolidated Fruit-Jar Co. v. Wright, 94 U. S. 94; Andrews v. Hovey, 124 U. S. 709, 8 Sup. Ct. 676.]

2. An inventor may abandon his invention to the public at any time. Abandonment is a matter of fact to be proved. It is never to be presumed.
   [As to what constitutes an abandonment, see Locomotive Engine Co. v. Pennsylvania R. Co., Case No. 8,454; McGaw v. Bryan, Id. 8,793; Thompson v. Haight, Id. 13,957; Woodbury Patent Planing-Mach. Co. v. Keith, Id. 17,970; Sayles v. Chicago & N. W. R. Co., Id. 12,414; Bell v. Daniels, Id. 1,247; Adams v. Edwards, Id. 53; Adams v. Jones, Id. 57.]

3. The "public and common use" in the United States necessary, under the sixth section of the act of March 3, 1839, to invalidate a patent for an invention previously patented in a foreign country, is a common and general use by the community.

4. What would amount to such use depends upon the nature of the invention patented.

5. It is not necessary that the drawings of a patent should be capable of use as working drawings, or that a machine made according to the exact scale of the drawings should be an operative machine. It is sufficient that the invention be so described and shown that one skilled in the art to which it relates would be able, by the aid of the description and drawings, to embody the invention in an operative and efficient form.
   [Cited in Hamilton v. Ives, Case No. 5,982; Henry v. Francestown Soapstone Co., 2 Fed. 78.]

6. Where, in a suit for infringement of a patent, no question is made by the pleadings as to the novelty and originality of the patented invention, and the prior use relied on in defence is a use by the inventor or under his license, it is not necessary to give notice of the persons so using the invention, or the places where it was used.

7. If an inventor has abandoned his invention to the public, his right to a patent therefor is irrevocably lost.
   [8. Cited in Henry v. Francestown Soapstone Co., 2 Fed. 80, to the point that, to work a forfeiture of a patent by a sale more than two years prior to the application for the patent, the thing sold need not have been perfect in the mechanical sense, but only in that it embodied the completed invention in a form which would be operative.]
   [9. Cited in Rein v. Clayton, 37 Fed. 357, to the point that an inventor has no right to his invention at common law, but that such right is the creature of statute and of grant.]

At law. This was an action on the case, tried by Judge Shepley and a jury, and brought [by the American Hide & Leather Splitting & Dressing Machine Company against the American Tool & Machine Company and George H. Fox] to recover damages for the infringement of letters patent for an "improvement in leather-splitting machines," granted to Joseph F. Flanders and his assignee, Enos G. Allen, August 14, 1860, [No. 29,649.] The patented invention was an improvement upon and particularly applicable to leather-splitting machines, in which was employed a "belt-knife," consisting of an endless band of steel having a cutting edge and made to run over two pulleys like a belt, which was the subject of invention described in letters patent granted to the said Joseph F. Flanders and one Jeremiah A. Marden, August 29, 1854. The nature of the invention set forth in the patent of 1860, in controversy, is indicated by the following language of the the specification: "In machines for splitting leather it has been found extremely difficult, on account of the varying thickness of the hide, to cut or split the grain of uniform thickness throughout, the tendency to form an irregular cut being increased by the weight of the split which drags the leather downward from the knife. The essential feature of my invention consists in a novel arrangement of devices whereby these objections are entirely obviated, the uniformity of the thickness of the grain being invariably secured, whatever may be the irregularities of the leather to be split. The desired result is effected by the use of a sectional roll, consisting of rings hung loosely upon a shaft immediately under the leather and made to have an upward bearing thereon by means of an India-rubber roll, or other suitable elastic bearing that presses upward against the rings. This arrangement constitutes in

---

[1] [Reported by Jabez S. Holmes, Esq., and Samuel S. Fisher, Esq., and here compiled and reprinted by permission. The syllabus and opinion were taken from Holmes, 503, and the statement from 4 Fish. Pat. Cas. 284. Only partially reported in Merw. Pat. Inv. 99.]

effect an elastic bearing to the leather, consisting of a series of separate and independent springs that possess all the necessary elastic force and yet are remarkably free to play, much more so than any ordinary arrangement of springs, thereby affording a yielding and elastic bearing to every inequality or indentation of the leather, and one that is peculiarly sensitive thereto. Although the sectional roll may be placed directly over the elastic roll, I prefer to place it a little to one side of the vertical axis thereof, as when placed in the same vertical line, the rings, by the motion of the rubber roll, have a tendency to crowd back and then to snap forcibly back against the leather, which prevents the cut from being uniform. What I claim as my invention, and desire to have secured to me by letters patent, is: First. The arrangement of sectional rollers for the direct or immediate support of the hide, or leather, at the delivery of the same to the edge of the circulating knife in combination with a roller located below the sectional roller and constructed as described with elastic surface and fixed bearings. Second. Placing the sectional roll to one side of the vertical axis of the elastic roll as described.

The evidence tended to show the following facts: This invention was made by Flanders as early as July, 1855, while endeavoring to improve the construction of a leather-splitting machine embodying the improvements secured by the prior patent of Flanders and Marden. In January, 1856, he and the other owners of that patent sold it to a corporation known as the American Leather Splitting Company, which proceeded to manufacture machines embodying not only the improvement patented to Flanders and Marden, August 29, 1854, but also the other improvements which afterward formed the subject matter of the Flanders and Allen patent of August 14, 1860. During the fall of 1856, one or two of these machines were publicly exhibited in operation at the factory of the Patent Tanning Company, in Newark, New Jersey, and were offered for sale to the public; and before April, 1858, the American Leather Splitting Company made the following sales of such machines, viz: one to the Chadwick Patent Leather Manufacturing Company at Newark, in December, 1856; one to Joseph Byron, at West Roxbury, Massachusetts, in March, 1857; one to J. H. and T. W. Dawson, at Newark, in the spring of 1857; one to Julius S. Shailer, at Roxbury, Massachusetts, in the summer of 1857; another to the Chadwick Patent Leather Manufacturing Company, at Newark, in February, 1858, and one to R. Ward & Co., at Newark, in March, 1858. All these sales were made with the full knowledge and consent of Flanders, who owned largely in the capital stock of the American Leather Splitting Company, and acted in its behalf to exhibit these machines and to procure the sale of them, and in fact set up and put into operation the

four machines above mentioned that were sold at Newark. In March, 1858, Flanders procured Samuel Cooper, a patent solicitor of Boston, to solicit for him an English patent for a leather-splitting machine, containing the very improvements which were afterward set forth and claimed in the letters patent of the United States, granted to Flanders and Allen, August 14, 1860. This English patent was granted and sealed June 25, 1858, to one William Edward Newton, an English resident, who acted as Cooper's agent and who held the patent for Flanders' sole benefit. In July, 1858, Flanders sold another of these machines to William Pyle, of Wilmington, Delaware, and in October, 1858, he entered into a written agreement to sell such machines on commission for Pyle, who had then bought the exclusive rights under the Flanders and Marden patent for the states of Massachusetts, New York, and New Jersey. Before the year 1860, there had been in all about ten of these machines sold and put in operation, of which, at the date of this trial, two at least were still in use, and the remainder had been continued in use for different lengths of time from one to five years, and the machine sold by Flanders to Pyle, in July, 1858, was employed so constantly and efficiently that there were split by it on an average, from that time until July, 1861, some ten thousand hides per year. The machines made and sold prior to 1860 were, however, not well constructed nor well proportioned. They needed constant repair, and underwent many alterations in their working parts to improve their mechanical operation and means of adjustment; but, nevertheless, no substantial change was ever made in the arrangement and mode of operation of the sectional roller and the rubber roller upon which it rested, after the first machine had been exhibited in successful operation at Newark, in the fall of 1856. In 1860, George H. Fox & Co. bought of William Pyle the exclusive rights secured by the Flanders and Marden patent, within and throughout the state of Massachusetts, and a year or two afterward they also bought the exclusive rights under the same patent for the state of New York, all of which they at a later date sold and transferred to the American Tool and Machine Company, which further secured to itself the same rights under the extension of that patent; and the bell knife leather splitting machines that have been manufactured and sold into use by these owners—who are the defendants in this case —have been greatly superior to the earlier machines in their mechanical construction. There was also testimony that, at the time of the trial, there were about forty of these machines in operation within the United States; that they were expensive machines both to construct and to keep in repair; and that the number of places in the country where they could be employed to advantage was comparatively few. The date of Flan-

ders' application for the patent granted to him and Allen was April 11, 1860.

Baxter E. Perry and Alfred B. Ely, for plaintiffs.

George L. Roberts, for defendants.

SHEPLEY, Circuit Judge, [charging jury.] This is an action brought by the American Hide and Leather Splitting and Dressing Machine Company, as plaintiff, against the American Tool and Machine Company and George H. Fox, as defendants, for an alleged infringement of letters-patent of the United States, granted Aug. 14, 1860, to Joseph F. Flanders, the alleged inventor, jointly with one Enos G. Allen, to whom Flanders had assigned one-half of his interest prior to the issue of the letters-patent, which, by mesne assignments, are alleged to have passed to the plaintiff corporation before the date of the infringement complained of. The defendants do not deny, and for the purposes of this trial it is admitted, that they made and sold one machine embodying the invention described and claimed in the letters-patent declared on; and that, therefore, they have infringed the plaintiff's rights, unless they have established by evidence one or more of the defences set forth in their special pleas, or have proved to the satisfaction of the jury one or more of the special matters in defence of which they gave notice under the statute. The principal grounds of defence relied upon in this case are: First, that the invention was in public use and on sale, with the knowledge and consent of the inventor, more than two years prior to his application for a patent; second, that he had abandoned the invention to the public prior to his application for a patent; and, third, that the same invention had been patented by him in England more than six months prior to his application for a patent in the United States, and had been introduced into public and common use within the United States prior to his application for a patent in the United States.

Now, as to the first of these three grounds of defence, the act of March 3, 1839, modified the law of patents as it existed under the act of 1836, and as it had previously existed with regard to the public use of the invention prior to the application for a patent. Since the act of March 3, 1839 (except in case of proof of abandonment to the public, or what perhaps would be a better term, dedication to the public, though I have used the words of the statute), no purchase, sale, or use of the invention invalidates a patent, unless such purchase, sale, or use has been for more than two years prior to the application for a patent; but a public use or sale of the invention, with the knowledge and consent of the inventor more than two years prior to his application, does invalidate a patent and make it void. The burden of

proof is always on the defendant who sets up such prior sale or use; and he must show it to have been with the knowledge and consent of the inventor, and to have been public in the ordinary way of a public use or sale of a machine, and not to have been a use for the mere purposes of experiment. But if it is in public use or on sale with the consent or allowance of the inventor more than two years prior to his application for a patent, and not in use merely for the purposes of experiment, then, as I have already instructed you, the patent is void. I shall have occasion to call your attention more particularly to this matter hereafter, when I come to refer to the special instructions which have been asked for in relation to some of the questions arising with regard to public use and to abandonment. In this view of the law, gentlemen, what is the testimony in relation to the public use and sale of this invention more than two years prior to the application? The date of the application for this patent is April 11, 1860. About that, there is no controversy. The question, then, under the first branch of defence, for you to consider, is, whether this invention was in public use or on sale with the knowledge and consent of the inventor prior to April 11, 1858. Such public use, within the statute applicable to this branch of the defence, may be by the inventor himself, of one machine, or by any other person, with his knowledge and consent or approval. I do not instruct you, as matter of law, that such public use or sale of one machine would necessarily involve it; but I say the jury are authorized, if they find one machine to have been in public use or on sale, with the knowledge and consent of the inventor, more than two years prior to his application for a patent, to find that sufficient to make the patent void. This is distinguishable from the "public and common use," which I shall have occasion to refer to hereafter, and which makes a patent void if it continues for more than six months before the patent is applied for in this country after the inventor has taken out one in England. That "public and common use" is a different use from the "public use" referred to in the sixth section of the statute of 1839.

It is not my purpose or intention, gentlemen, to recapitulate to you the testimony in this case, but only to call your attention to enough of the evidence, on either side, to enable you to understand the application to that testimony of the principles of law which I shall state to you. The Flanders and Marden patent of Aug. 29, 1854, was obtained for the rotating knife, which has been explained to you and exhibited in the drawings and models. Under that patent, which passed through successive mesne conveyances into the possession of a corporation bearing the name of the American Leather-Splitting Company, to the titles of which the present plaintiff corporation is the successor, the first

machine which was constructed by the inventor, Flanders, originally contained only the application of this rotating knife to an old machine which was then in existence; and this first machine, as he constructed it, contained apparently no new device except that of the rotating knife; but before he conveyed his interest in this patent and in the machine, which was then in the process of manufacture and perfection, to his sub-owners, and before they conveyed to the American Leather-Splitting Company, the device of the sectional rollers and the rubber roller, according to the testimony as I understand it, and as I understand it to be uncontradicted, was inserted in the machine which passed to them; and if I understand the testimony rightly, the American Leather-Splitting Company never made, never sold, never put on sale or exhibition, or had manufactured, any machine that did not contain this device of the sectional rollers and the yielding elastic rubber roller upon which they rested.

With the exception of the first machine which went into Sibley's shop, in Hawley street, and which was never sold to the public, but was only being manufactured for the purpose of experiment, some time in the year 1855, I have failed to see any evidence in this case (you will judge, gentlemen) that any machine was ever made by Flanders, by his grantees, or by anybody under that patent, or was ever put upon sale or upon exhibition, which did not contain the device of the sectional rollers and the rubber roller, substantially as set forth in the subsequent patent of Aug. 14, 1860; that is to say, according to the testimony of witnesses examined on the respective sides, the device of the sectional rollers, resting upon this rubber roller which had a fixed axis of revolution so as to embody the principle of adapting the under surface upon which the leather rested to the inequalities of the thickness of the leather to be split, so that, however unequal the under surface might be, the upper surface should always be in a line parallel with the gauge-roller above it, so that the knife should cut from the leather a slice or layer or stratum, which should be of uniform thickness. I say, there is no question in this testimony, so far as I have seen, that this device of the sectional rollers with the rubber roller, thus put in for that purpose, was in every machine that ever was held out here to the public as a leather-splitting machine under the Flanders and Marden patent. That does not make it certain that this device passed by title to the American Leather-Splitting Company, or that it ever came by mesne assignments down to the present company, who are the successors to the title of that company in the Flanders and Marden patent. It does not follow, because that device was in those early machines, that it ever came to the defendants, who own the rights under that

patent in two states, or in the state of Massachusetts, which is enough for the present inquiry. These defendants have no record title. I instruct you that they have no record title to Flanders's invention of this device under the conveyances which have been read to you. Flanders did not undertake to convey to those under whom they claim title any thing but what his patent of Aug. 29, 1854, described, and that was his rotating knife. But then, gentlemen of the jury, you are to inquire whether he did or did not at the same time convey to them a machine embodying this device, and whether he did or did not, as a stockholder in the American Leather-Splitting Company, and as their agent, under the patent and rights so conveyed to them, introduce to the public and put on sale and in public use a machine embodying this invention, which he has described in the patent of Aug. 14, 1860. And if you find that prior to April 11, 1858, that corporation, with his knowledge and consent or allowance, or that he himself, acting as the representative and agent of that corporation, sold one or more of these machines, embodying not only the invention which he had described in the Flanders and Marden patent, but also the device referred to in the first two claims of the patent of Aug. 14, 1860, and called here the sectional rollers and rubber roller; and if you further find that the machine thus put in public use and on sale prior to April 11, 1858, was, so far as the invention of that device was concerned, an effective, operative, and useful machine; that is, that the machine successfully, for practical use, split leather, holding it up to its proper position to be split by the operation of the devices described in the patent of Aug. 14, 1860, so as to retain the upper surface of the leather in a line parallel with the cutting knife and so as to cut the upper portion of the leather of a uniform thickness without regard to the inequalities in the thickness of the under portion: then the patent obtained by him afterward for the invention of this device was void; and it would be a fraud upon the public, to whom those machines had been sold, and a fraud upon that corporation whom he had thus allowed to incorporate and sell this device in those machines, for him to attempt to set up this patent against them.

Much has been said to you about the rights and claims of the inventors. An inventor has no right to his invention at common law. He has no right of property in it originally. The right which he derives is a creature of statute and of grant, and is subject to certain conditions incorporated in the statutes and in the grants. If to-day you should invent an art, a process, or a machine, you have no right at common law, nor any absolute natural right, to hold that for seven, ten, fourteen, or any given number of years, against one who should invent

it to-morrow, without any knowledge of your invention, and thus cut me and everybody else off from the right to do to-morrow what you have done to-day. There is no absolute right, or natural right at common law, that I, being the original and first inventor to-day, have to prevent you and everybody else from inventing and using to-morrow or next day the same thing. But there is a statutory right, a public grant of a monopoly, which does enable you or me to do this. If we are the original and first inventors, the law secures to us a monopoly of the invention for a given number of years, upon certain conditions; and one of those conditions is, that we shall not put this invention on sale or in public use. and then, after the lapse of more than two years, treat as infringers everybody else who has it in public use or on sale, and who may not have it by grant from us. The condition is no more inequitable than the grant itself. The patentee gets his right to the patent, not on the ground of any inherent natural right which he has, or right at common law, but because he is entitled to it by the terms of the statute of the United States which gives it to him; and, therefore, he has no rights except in compliance with those terms and upon those conditions. Now, gentlemen, you will apply these principles to the consideration of the testimony in this case. You will consider, in the first place, whether these machines were put on sale or in public use prior to April 11, 1858; whether Flanders knew it, and allowed it, or consented to it. You will then consider whether the machines which he had in use and on sale, if any, or which were put on sale and in public use prior to April 11, 1858, with his consent or allowance, embraced and embodied the devices and the invention described in the letters-patent of Aug. 14, 1860. If you find they did, you will then consider whether those machines so put on sale or in public use were effective, operative, successful machines, competent to do the work which that invention was calculated and intended to perform; and then you will consider whether such machines were put on sale or into public use as matters of profit and gain, or whether it was for the mere purpose of experiment and perfecting the invention.

I instruct you upon this point that if Flanders, with the consent of those to whom he had sold the Flanders and Marden patent for the rotating knife, or with the consent of the purchaser from them of a machine embodying that invention, attached to that machine an invention which he had made separate and distinct from the invention described in that patent; and if he put it on for the mere purpose of experiment, to see whether it would work, and with the view of perfecting it as a separate invention, and not for the purpose of rendering the machine which had been sold perfect as an operative machine; that would not be such a public use or sale as would invalidate his patent, or deprive him of the right to a patent. In that view, gentlemen, you will take into consideration the testimony which has been introduced to you. Is there or is there not any evidence in this case, that when these machines were exhibited in the tanning company's office, in Newark, New Jersey, when they were sold to the Chadwick Company, to Dawson, and to Byron, any of these parties were informed by Flanders, who is testified here to have had intimate knowledge of all these sales and of the operation and working of these machines, that in purchasing them of the corporation which then owned the Flanders and Marden patent, they were not obtaining the right to use the whole machine and all the devices embodied in it, or that there was any particular device attached to the machine for the mere purpose of experiment and test? What was the operation which was going on when Flanders was endeavoring to perfect that machine in these different workshops and factories in which he had placed it in use and on sale? Has it or has it not, been proved here that those machines were sold, in some instances the sale not to take effect until the machine was an effective working machine? Was or was he not, laboring to make those machines under the Flanders and Marden patent operative and successful? And was he or not, experimenting with a view to make these machines under that patent successful; or was he experimenting with a view to perfect another device and invention, in which none of the owners of those machines. Chadwick, Byron, Dawson, Shailer, or any of those grantees, was to have any right or interest?

Language has been used by the court in regard to such use of a device, before the obtaining of a patent, which seems to me particularly applicable to this case. I refer to the case of Sanders v. Logan, [Case No. 12,295:] "It is clear, therefore, that assuming that Sanders was the sole inventor of the machine as perfected in 1845, with Justus's assistance, yet that he was not entitled to a patent for the same. The evidence established a clear case of abandonment; and, moreover, that the invention was publicly used, with the knowledge, consent, and approbation of the complainant more than two years previous to his application for a patent. The allegation that these machines were made and incorporated into so many mills all over the country for the purposes of experiment, is too absurd to be entertained for a moment." Now, is it or is it not true in this case, that wherever the Flanders and Marden machine was used, wherever it was exhibited, and wherever it was sold, there was attached to it the invention or device described in the patent of Aug. 14, 1860? I do not understand that there is any controversy on that point. I have

not heard any evidence that any machine was ever set up, sold, exhibited, or put in use, which did not contain this device, with one single exception. It is claimed on the part of the plaintiff that all the machines did not contain this device in the manner referred to in the second claim of the patent of Aug. 14, 1860, because it is contended that a perpendicular plane which would pass through the axis upon which the rubber roller revolved would be coincident with the perpendicular plane which passed through the axis upon which the sectional rings revolved; while, on the part of the defendants, it is contended that in some of the machines, if not in all of them, which were thus sold, the perpendicular planes passing through the respective axes of the rubber roller and the sectional roller were not coincident. In the one case, the two cylinders would be the one directly over the other; in the other case, they would be at an angle, more or less. That is a question upon which you have testimony here from the different parties; it has been very fully and ably commented upon by the respective counsel, and therefore it is unnecessary for me to recapitulate.

Then the next question is: If these machines were thus put upon sale and into use, were they constructed so as to operate successfully? Mr. Shailer, one of the witnesses, for instance, testifies that he used one of them for a number of years; that it had everything in it which it has now, and was as good a machine as it is now; that he split leather with it for himself, and took leather in to split by it. He says: "When we first had it, the two axes were nearly in the same perpendicular plane. Afterward, we altered the axes toward an inch apart from each other; namely, the plane of the axis of the sectional roller an inch from the plane of the axis of the rubber roller. After exhibiting it several weeks, we sold one machine. After we made these alterations, the machine worked as well as the machine now does. The one sold to the Chadwick Company," he says, "worked admirably. Whenever the knife was in proper position, we did splitting as well as it could be done. The machine has been but very little improved since." Several other witnesses have testified as to the amount and quality of the work that the machine did. But there is another matter which it is proper for you to consider, as affecting the question whether this was a successful and operative machine, working well; and that is this: It is claimed on the part of the plaintiff, that, although these machines may have embodied the devices described in both these patents, the machines which were put on sale and in public use were not perfect machines; that perfection had not been attained; and that they were put on sale in a crude and unfinished condition, for experiment. It is not for you to consider upon this point whether this whole machine used for splitting leather was or was not a perfect machine in the sense in which "perfect" is usually understood. You are to consider whether the machine, so far as it covers these devices, was or was not a perfect machine, so far as these devices are concerned. You are to consider whether it was perfect in the sense that it embodied a completed invention, and not whether it was perfect in mechanical execution, as you might expect a machine to be in its most highly finished state of mechanical perfection. A perfect machine, in that sense of the word "perfect," means a perfected invention; not a perfectly constructed machine, but a machine so constructed as to embody all the essential elements of the invention, in a form that would make them practical and operative so as to accomplish the result. But it is not necessary that it should accomplish that result in the most perfect manner and be in a condition where it was not susceptible of a higher degree of perfection in its mere mechanical construction. If, therefore, you find that prior to April 11, 1858, this machine was put in public use and on sale, with the consent and allowance of Flanders; if you find that it did embody the devices and invention described in the patent of Aug. 14, 1860; and if you find that it embodied all of that invention in a form that was practical, operative, and useful: then it is a bar to this patent, and the patent is void.

The next ground of defence is an alleged abandonment to the public. That does not differ very materially, so far as its application to this case is concerned, from the question of public use and sale, except that the abandonment to the public, in the sense in which it is here used, need not be two years before the date of the application for the patent: it may be afterward, although the presumption always is against an abandonment to the public by a patentee after he has applied for his patent. But he can do so; he can do so within two years; he can do so at any time. It is a matter that may be proved, but it is never to be presumed. A person is sometimes said to have abandoned his invention when he gives up the idea; abandons it in the popular sense; relinquishes the intention of perfecting his invention, so that another person may take up the same thing and become the original and first inventor. But that is not the kind of abandonment that is referred to here. There is another kind of abandonment; and that is where a party, having made an invention, allows the public to use it, with his knowledge and consent; allows it to be incorporated into other machines with his knowledge and consent, and to be used by anybody without objection; as, for instance, if you should invent a machine, put it into public use and sell it to everybody who chose to buy it, and if you should attach to that machine another invention of yours,

and allow everybody who chose to buy that and use it, without objection on your part, with your consent, with your permission, with your allowance, not for the mere purpose of experiment, but for the purpose of profit and gain, that would be an abandonment of it to the public; and you could not afterward rightfully, honestly, honorably, legally, take out a patent for that invention. "The question arises upon this provision, then, whether the particular purchase, sale, or prior use may of itself, under some circumstances, furnish proof of abandonment to the public, or whether such an abandonment must be proved by other cases, or by other evidence dehors the particular purchase, sale, or prior use, that happens to be in question. The obvious construction of the act is, that a purchase, sale, or prior use before the application for a patent, shall not invalidate it, unless it amounts to an abandonment to the public; a purchase, sale, or prior use shall not have this effect, per se, but, if connected with facts which show an abandonment to the public, or if it has been for more than two years prior to the application, it will have this effect." Curt. Pat. (Ed. 1867,) pp. 417, 418, § 393: I read this to you, because these are not merely the words of the text-writer, but the exact words of the decision of the court as to the construction of this clause of the act of 1839. The other ground of defence set up here is, that this invention had been patented in England more than six months prior to the application for a patent in the United States, and had been introduced into public and common use in the United States prior to that application. Upon that I am requested by the plaintiff's counsel to instruct you that "section 6 of the act of 1839 must be construed in connection with section 7 of the same act, and that the purchase, sale, or prior use named in section 7 differs from the public and common use named in section 6, or else the two are incompatible." That alternative I need not put in; but I give you the instruction, that the "public and common use" in the sixth section which has been read to you, and which applies to public and common use prior to the application for an American patent, where there is an English patent procured by the inventor more than six months prior to the application for an American patent, is a different use from the "public use" which I have already explained to you, and which, having obtained for more than two years prior to the application, voids the patent.

This "public and common use" prior to the application in this country, in the case of a foreign patent procured by the inventor more than six months before his application here, must be something more than the mere use of one machine or more by the inventor himself, in public, or by other persons with his consent and allowance. The invention must have passed into general use in the community. To invalidate a patent upon the ground of a prior English patent, the use of the thing patented must not only be public within the United States, but must be a common and general use by the community. There is an obvious reason in my mind for this distinction, which existed in the statute in force up to the act of July 8, 1870, but which does not now exist, because the time has been extended to two years, and the word "common" has been stricken out. In order now to void a patent upon the ground of a prior patent in England, the invention must have been in public use two years prior to the application here, although it is not required to be in common use; but this law was not in force before the act of July 8, 1870, and is not applicable to this case. This case is to be decided upon the construction of the statute of 1839; and I instruct you that the use referred to in the sixth section of that act must be a general use as well as a public use; it must be a common use as well as a public use of the invention which is to void the patent in the United States, if it has been prior to the application here, in case there has been a patent taken out in England by the patentee more than six months before his application here. What would be a common use, however, must be considered with reference to the device invented or the thing patented. What would be a passing into common use of one invention might be a very different thing from what would be a passing into common use with regard to another invention. For instance, a hotel annunciator might be an invention applicable to hotels alone, and useless for any other purpose. Such an invention could never come into common use in the community in the sense in which a friction-match or a paper-collar would, or any other device or invention which was intended to be used by the community. You might, therefore, in the case of the annunciator, consider its use, in a very few instances, a common use, as compared with what would be a common use of a thing designed for the use of every person. So there might be an invention applicable to only one species of manufacture; and if there were only three manufacturers of that particular article in the United States, and each one of these three publicly used the invention, and if they were the only persons who would be likely to use, or whose business would require them to use, such an invention, you might be justified in finding that that invention had passed into public and common use when it became universal with all the persons or in all the manufactories for whose use the invention was designed.

And I instruct you further, that if an inventor obtained an English patent more than six months before he made his application in the United States for a patent for the

same invention, and after it had been patented abroad and prior to the application here, that invention passed into public and common use in this community so as to become a part of the manufactures of this country, then whether the persons through whom it had been introduced here had derived their information of it from the English patent, or had invented it themselves, or had derived it from the first inventor himself, the patent would be void. The statute was intended to require the patentee to use reasonable diligence and to fix a proper time within which he must make his application, in justice to the public; so that an invention which has been patented abroad, and has become a matter of public notoriety, and of common knowledge among persons engaged in that art or manufacture, shall not pass into the commerce of the country and into common and daily and public use by the community, and then, after the lapse of any length of time, the party go on and obtain a patent and prosecute the whole community as infringers. Congress has, with propriety, fixed a time which they consider reasonable for the exercise of diligence in this matter; and if you find that this inventor allowed that time to pass by, and that this invention had been introduced into public and common use, into general use in the community, then this patent is void. And in determining what is common and general use, you have a right to take into consideration the nature of the machine, the effects which it is designed to produce, and the number of persons or of manufactories likely to use it, so as to determine whether, in view of all the devices which constitute the characteristics of the invention, and the uses to which it can be, and is designed to be, applied, the use is a general and common and public use, or a private, special use, under a particular grant or license.

I have said, gentlemen of the jury, that I do not intend to recapitulate the testimony in this case. These questions of fact it is your province to determine; and I do not wish you to consider any thing I have said as intended to influence you in your determination of them. I am only endeavoring to give you the principles of law which are to guide you, and which you are to apply to the consideration and determination of these questions of fact. It is for you to find whether, upon the testimony, there has been this public use and sale or not; whether it has been for the length of time, under the circumstances and conditions which I have previously stated to you. It is for you to find whether there has or has not been this abandonment or dedication to the public; and it is for you to find whether or not this invention had been introduced into public and common use prior to the application for a patent, in this country, under the conditions which I have stated to you in relation to the English patent. Whether the English

patent is or is not for the same invention, you have had the testimony of experts, and you will have the drawings and models before you. The conflict apparent in the testimony upon that point relates principally to one question, and that is, the practicability of making an operative, effective machine by the aid of the specification and drawings of the English patent. Now it is not necessary, in order to make a patent valid, that the patentee should so make the drawings in his patent that they could be used for working-drawings, or that a machine made in accordance with the exact scale of the drawings, which accompany the patent in the patent office, either in England or in this country, should be an operative machine. It is necessary, however, that the patentee should so describe his invention that a mechanic skilled in the art to which that invention relates would be able by the aid of the description and drawings of the patent to embody that invention in a practical, operative, efficient, and effectual form. That is all that is necessary; and, therefore, if you find, upon a critical examination of these drawings, that there are some slight differences in distance, or in proportion, which, if exactly carried out upon the same scale, in a machine constructed according to the patent, would require modification in order to make the machine operative, that does not affect the question. You are to consider whether, in the light of the testimony which has been introduced to you, on both sides, the English patent does or does not embody what is in the American patent, striking out of consideration those claims in the respective patents, which are not in issue here, and whether, so far as relates to that invention which is in issue here, they are or are not identical.

I am requested by the plaintiff to give you the following instructions:

I. "If the defendants give notice of special matter in defence under the general issue, and rely upon any prior knowledge or use of the thing patented which the statute may contemplate as a defence to the action, they must give the names and places of residence of those whom they intend to prove had any such knowledge, and where such use was had." I have already ruled upon this point; and I instruct you, that, upon the pleadings in this case, there being no question made that the plaintiff's patentee was the original and first inventor, and the prior use relied upon being a prior use only by the inventor himself, or under his license, it is not necessary, in the statutory notice, to give the names of the persons using, or the places where used. I therefore decline to give you the first instruction requested by the plaintiff. In the construction I give to the statute, when a party gives notice of special matter of defence under the general issue, and in that notice sets up priority of invention and of use by oth-

ers, for the purpose of showing that the patentee was not the original and first inventor, he must in his notice specify the names of the persons using, and the place where used; but if the prior use relied on be a use by the inventor, or by persons with his consent or allowance, then it is not necessary to notify him of the names of the persons using the invention, or of the places where used.

II. The second instruction asked for is, that "abandonment means a general abandonment to the public, and must be shown affirmatively and positively as affecting the interest of the party." I give you that instruction, saying here, that, in the sense in which "abandonment" is used in this connection, it is dedication to the public; a giving up of the claim to monopoly in the invention: and it must be shown affirmatively. The burden is upon the defendants.

III. The next instruction which I am requested to give you is, that "'use and on sale with the consent and allowance of the inventor,' means use and sale of the perfected invention, and not its use in an imperfect and inchoate and experimental condition. If, therefore, in this case the use prior to April 11, 1858, would seem to be that of an invention not perfected, which the inventor was striving to make perfect and practical, it would not be such a use as would work forfeiture, but would be considered experimental only." One portion of that instruction I give you. I do not give you the inferences which are drawn from it. "Use and sale with the consent and allowance of the inventor," does mean use and sale of the perfected invention, and not of the invention in an imperfect, inchoate, and experimental condition. But then, gentlemen, you must distinguish between the invention and the machine which embodies it. The invention may be perfect, and the machine which embodies that invention and several others may be an imperfect machine. In this instance, the imperfection of the rotating knife, which was the subject of another invention in these machines, would not have made this invention imperfect. Suppose that the machine had had a badly cutting knife, or that, in consequence of the imperfection of the jaws which held the knife in place, there had been so much friction that the knife did not operate, it would not be for your consideration here. You must apply this instruction to the devices and mechanism which are the subject of the invention in this patent, and not to the machine embodying several other inventions. So far, then, as relates to this invention, the public use and sale referred to must be of the perfected invention, and not of an experiment, or for the purposes of experiment, or in a merely experimental form.

IV. The next instruction requested is, that "the putting of a device intended to improve the working operation of a patented machine upon such machine, when sold, would not necessarily be such sale of the device as would work abandonment and forfeiture of right to a patent, but might well be put on for experimental purposes, and especially where such is the best, if not the only, means for the inventor to test the practical utility of the device." I give you that substantially. I give it to you in these words: The putting of a device intended to perfect the working operation of a patented machine upon such machine, when sold, would not necessarily imply that the patentee intended to abandon it to the public, or to put it in public use or on sale. But that is a question of fact purely, for your determination. Whether he put it on merely for the purpose of experiment, or put it on and sold it with the rest of the machine, for gain and profit, and let it go into public use, is a question of fact for you to determine.

V. The next instruction asked has reference to the sixth section of the act of 1839, and I have already given it to you.

VI. The next is as follows: "Without regard to section 7 of the act of 1839, if the English machine, as shown, would require experiment and change in regard to the adjustment of the parts, in order to bring it to the perfection of the American machine, as shown, the English patent will not be allowed to work forfeiture of the American patent." I do not give you this instruction in the words in which it is requested, because I think it is ambiguous. I do, however, instruct you, that if the English machine is shown to have required further invention to make it a practical and operative machine, and to embody the same invention which is described in the American patent, it would not work a forfeiture of the American patent. I do not say that, if the English machine would require change or adjustment of its parts, it would not work such forfeiture; because a change or adjustment of its parts might have nothing to do with the question of invention. But if you find that in the English machine there was the same device, the same combination of elements to produce the same results in the same mode, so that there was an identity of invention, then it is immaterial whether it did or did not require more adjustment of parts or mechanical perfection to make it work as well or better than the American machine.

VII. The next instruction I am requested to give you is, that "it is not the policy of the law that an American inventor shall fare worse in his application for an American patent, by reason of his having previously obtained a foreign patent for the same invention, and the same having been published, than if the same thing had been patented abroad by some other person." I decline to give you that, upon the ground that it is not the duty of the court to instruct you as to what the policy of the law is, but only as to its construction.

I am also requested on the part of the defendants to instruct you:

1. "If the jury find that more than two years prior to the application of Flanders for the patent declared on, one machine embodying the invention set forth and claimed therein had, with his knowledge and consent, been sold or openly and publicly used by even one other person, he thereby forfeited his right to the patent." I give you that instruction, with the qualifications which I have already stated, and which are, that experimental use, or use to test it for the purpose of experiment, or for the mere purpose of perfection, not for gain or profit, and with no intention to put it into public use for any other purpose than experiment, is not the public use contemplated by the statute.

2. "If the jury find that more than two years prior to the application of Flanders for the grant of the patent declared on, one or more machines embodying the invention set forth and claimed therein had been sold and publicly used with his knowledge and consent, and if the jury further find that such sale and public use was caused or permitted by the said Flanders for the sake of pecuniary gain and profit directly or indirectly to himself, the same was incompatible with any use for the sake of experiment or trial of the machine, with the view of testing or perfecting it, which the law would allow, and the patent is therefore void." I do not give you that instruction in those words, because it combines a question of law and fact. Whether it is incompatible with the purpose of experiment or not, is a question not for me to determine. But I give it to you in this form: If the jury find that more than two years prior to the application of Flanders for the grant of the patent declared on one or more machines embodying the invention set forth and claimed therein had been sold and publicly used with his knowledge and consent, and if the jury further find that such sale and public use was caused or permitted by the said Flanders for the sake of pecuniary gain and profit directly to himself, and not merely for the sake of experiment and trial, with the view of perfecting the invention, then the patent is void.

3. "If the jury find that more than two years prior to the application of Flanders for the patent declared on one or more machines embodying the invention set forth and claimed therein were sold by him, or with his knowledge and consent, to be publicly used by the purchasers thereof in their ordinary and proper business, and that such machines were then capable of useful operation, when skilfully managed, and were thereupon in fact publicly put into useful operation by the said purchasers, such a sale and use worked a forfeiture of Flanders's right to the grant of a patent for the said invention." That instruction I give you.

4. "If the jury find that more than two years prior to the application of Flanders for the patent declared on one or more machines containing and embodying the invention set forth and claimed therein had been sold by him, or with his knowledge and consent, and if they also find that the said machine or machines after such sale were put into useful operation by the purchaser or purchasers thereof more than two years prior to the said application, the forfeiture of Flanders's right to the grant of the said patent would not be avoided or removed by any alteration, modification, or improvement in the mechanical construction or mode of operation of the said machine or machines, which may have been made between the time of such sale and of such useful operation, provided that when so put into use and operation they continued to embody the said invention." I do not give you this instruction in the exact words in which it is asked, because I have already instructed you upon this subject, carefully distinguishing, what I do not think this so fully distinguishes, such modifications as amount to structural changes from such modifications as amount to mere mechanical perfection of the machine.

5. "If the jury find that more than two years prior to the application of Flanders for the patent declared on one or more machines embodying the invention set forth and claimed therein were sold by him, or with his knowledge and consent, to be used by the purchasers thereof freely and openly in their regular business, and if the jury further find that the said machines were thereafter in fact put into useful operation by the said purchasers, the said patent is invalid, even if the said machine or machines so sold were, before being put into useful operation, modified, altered, or improved, in their mechanical construction or mode of operation in respect to any parts thereof not claimed as new in the said patent." I give you that instruction, substantially, in these words: If you find that more than two years prior to the application of Flanders for the patent declared upon, machines embodying the invention set forth and claimed therein were sold by him, or with his knowledge and consent, to be used by the purchasers, and were freely, openly, and publicly put into useful operation by them, the patent is invalid without regard to any such modification, alteration, or improvement in the other parts of the machine which did not embody any part of this invention and were not claimed as new in this patent.

6. "If the jury find that the English patent granted to Newton, April 27, 1858, was solicited and procured at the instance and request and for the benefit of the said Flanders, and that the specification and drawings thereof set forth substantially the same mechanism, arranged to operate in substantially the same mode as the mechanism set forth and claimed in the patent declared on, and if the jury further find that, prior to the application of the said Flanders for the grant

of the said letters-patent declared on, one or more machines embodying the invention therein set forth and claimed had been openly and regularly used by others in the ordinary prosecution of the business of splitting leather in a leather manufactory within the United States, then the said invention had been introduced into public and common use within the meaning of the statute in such case made and provided, and the said Flanders was thereby debarred from obtaining and receiving a valid patent for the same." I do not give you that instruction, because I have already stated to you that the "public and common use" mentioned in the sixth section of the act of 1839 is a different use from the "public use" mentioned in the seventh section, and this instruction seems to contemplate the identity of the two.

7. "If the jury find the facts in respect to the English patent to be as set forth in the sixth instruction prayed for, and the jury further find that within the United States, prior to the application of the said Flanders for the grant of the letters-patent declared on, machines embodying the invention therein set forth and claimed had been put and continued on sale to the public, and some of them had been actually sold to the public and put into open, continuous, and ordinary use by the purchasers thereof, then the said invention had been introduced into public and common use within the meaning of the said statute, and the said patent declared on is invalid." I have given you, gentlemen, what amounts very nearly to the instruction requested here, and I think it supersedes the necessity of my giving you this, because I have given to you full and general instructions as to what would constitute common use, and have stated to you that you had a right as a question of fact, in determining what amounted to common use, to consider the nature of the device, and result intended to be effected by the invention and the machine which embodied it, the number of persons in the community or of manufactories who might use it, and that there might be a common use of one invention which would be a very specific, restricted, and special use of another.

8. "If the jury find the facts in respect to the English patent to be as set forth in the sixth instruction prayed for, and if the jury further find that within the United States, and prior to the application of the said Flanders for the grant of the said patent declared on, machines embodying the invention therein set forth and claimed had been put and continued on sale to the public, and had in fact been sold to the public in numbers sufficient to supply the public demand for the same, and had thereupon been put into open and ordinary use by the purchasers thereof, then the said invention had been thereby introduced into public and common use within the meaning of the statute in such case made and provided, and the grant of

a valid patent therefor was prevented." I give you that instruction, omitting the words "open and ordinary use," and substituting the words "public and common use" for them.

9. "In determining how many such machines were sufficient to supply the public demand for the same at any time prior to the said application, the jury may properly take into account the character of the machine itself in respect to its cost of construction, the expense of purchasing and of running it, the number of men then having sufficient knowledge and skill to operate it effectively, and the number of places in the country where it could then have been profitably employed." I have already instructed you that you were entitled to take those elements into consideration in determining what constituted the "common use" of this invention.

10. "If the jury find that, prior to the application of the said Flanders for the patent declared on, machines embodying the invention set forth and claimed therein, and so constructed as to be capable of useful operation, were by others, with the said Flanders's knowledge and consent, put and continued on sale, and in fact sold and put into public use, and if the jury further find from the acts and declarations of the said Flanders that he intended to give to all purchasers of the said machines the free and unrestricted use of the said invention embodied therein, and to allow the sale and public use of the said machines to be continued by others without any claim on his part of any adverse right to the said invention, then he could not afterward resume his original rights in respect thereto, nor obtain a valid patent." I give you that instruction. That is to say: If you find, as matter of fact, that Flanders had once dedicated this invention to the public; had abandoned it, and allowed it to be made and sold and to go into public use with the other inventions embodied in the machine; it would not be competent for him to resume his original right to it. If a person has once abandoned his invention or dedicated it to the public, then, as a matter of law, it has gone from him, and he has no power of revocation or resumption.

11. "If the jury find that, prior to the application of Flanders for the patent declared on, he assigned, gave, or surrendered to others his rights to take a patent for the invention set forth and claimed therein, and that he in fact did not secure a patent for the benefit of those to whom he had so assigned, sold, or surrendered his said right, but acquiesced in and encouraged the sale and public use by them and their vendees of machines embodying the said invention, and that such machines were in fact, by those to whom the said Flanders had so assigned, sold, or surrendered his said right, sold, and by their vendees put into open and ordinary

use with his, the said Flanders's, knowledge, and consent, and if the jury further find that the said Flanders did not intend to apply for a patent to secure the said invention for his own benefit, and did intend to give the free and unrestricted use of the said invention to all purchasers of the said machines, then it was such a dedication and abandonment to the public as he could not afterward recall or revoke, and the said patent is void." I decline to instruct you that any specific state of facts would in law amount to abandonment, but I give you what is substantially this instruction. I have told you what would constitute abandonment; and I repeat to you, that if Flanders put this device upon these machines, without the intention of obtaining a patent for it, and allowed them to go out to the public. and to come into public use, so that whoever bought one of these machines embodying this device and invention had a right to use it without objection on his part, these are facts from which the jury, if they choose, have a right to presume a dedication to the public. Abandonment or dedication to the public is a question of fact for the jury to determine, not for the court; and I instruct you, that, if you find the state of facts to be as set forth in this instruction asked for, you have a right to find that Flanders abandoned his invention to the public, without instructing you that that follows as a matter of law.

12. "If the jury find that, prior to the application of the said Flanders for the patent declared on, the invention therein set forth and claimed was, with his knowledge and consent, embodied in leather-splitting machines so as to be usefully operative therein, and that such machines were, with his knowledge and consent, put and continued on sale to the public, and some of them actually sold to others and put into open and ordinary use, and if the jury further find that the said Flanders intended to give to the public the free and unrestricted right to continue the sale and use of such machines, he thereby forfeited his original right to the grant of a patent for the said invention." I give you that instruction, adding only one word: "And that such machines were, with his knowledge and consent, put and continued on sale to the public, and some of them actually sold to others, and put into open and ordinary and public use."

It is unnecessary that I should incumber you with a minute statement of the several issues of fact which are presented by the pleadings in this case. You will, therefore, consider the plea of the general issue, and under it the special defences set forth in the notices, and you will be prepared, when you come in, to answer to the court these questions:

First, Whether or not the invention was in public use and on sale, with the knowledge and consent of the inventor, more than two years previous to his application for the patent in issue.

Second, Whether or not the inventor had abandoned his said invention to the public prior to his application for the said patent. If you find that his invention was in public use and on sale, or that he had abandoned it in accordance with the instructions which I have previously given you, it is unnecessary for you to consider the other issue; but if you should not so find, then you will consider the special plea, and be prepared to answer:

Third, Whether or not the said invention had been patented in England by the said inventor more than six months prior to his application for the United States patent herein issue, and whether or not the said invention had been introduced into public and common use within the United States prior to his said application for the said United States patent.

The jury found for the defendants; and, upon being interrogated by the court, answered each of the foregoing questions in the affirmative.

[NOTE. So far as ascertained. there are no other cases reported prior to 1880 involving this patent.]